IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-433-D

MICHAEL CARMON, )
)
          Plaintiff, )
)
v. )     **ORDER**
)
PITT COUNTY, NEIL ELKS, in his official )
capacity as Pitt County Sheriff, and )
TRAVELERS CASUALTY AND SURETY )
COMPANY OF AMERICA, as surety, )
)
          Defendants. )

On July 9, 2018, Michael Carmon ("Carmon" or "plaintiff") filed a complaint in Wake County Superior Court against Sheriff Neil Elks ("Sheriff Elks"), in his official capacity as Sheriff of Pitt County, and "John Doe Surety Company," alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and wrongful discharge in violation of North Carolina public policy [D.E. 1-2]. On September 6, 2018, Sheriff Elks removed the action pursuant to 28 U.S.C. § 1446 [D.E. 1]. On October 15, 2018, Sheriff Elks moved to dismiss the complaint for failure to state a claim [D.E. 10] and filed a memorandum in support [D.E. 11]. On November 5, 2018, Carmon filed an amended complaint [D.E. 20], adding Pitt County ("Pitt County") and Travelers Casualty and Surety Company of America ("Travelers Casualty"; collectively "defendants") as defendants.[1] Travelers Surety is a Connecticut corporation that furnished a bond for Sheriff Elks pursuant to N.C. Gen. Stat. §§ 162-8 and 58-72-1. On December 14, 2018, defendants moved to dismiss the amended complaint for

---

[1] Carmon did not include "John Doe Surety Company" in the caption of his amended complaint, thereby voluntarily dismissing it as a defendant. See [D.E. 20].

failure to state a claim [D.E. 26] and filed a memorandum in support [D.E. 27]. On January 25, 2019, Carmon responded in opposition [D.E. 31]. On February 8, 2019, defendants replied [D.E. 32]. As explained below, the court denies as moot Sheriff Elks's motion to dismiss, grants in part and denies in part defendants' motion to dismiss, and dismisses Pitt County from the action.

I.

Carmon worked at the Pitt County Sheriff's Office for approximately twenty-three years before his termination on September 22, 2017. See Am. Compl. [D.E. 20] ¶ 14. When terminated, Carmon was a detention officer. See id. ¶ 15. Carmon is African-American. See id. ¶ 17.

On August 19, 2017, Carmon spoke with Nichelle Davis ("Davis"), a female detention officer, about the assignment of detention officers to the center's booking area. See id. ¶ 18. Carmon supervised Davis. See id. Davis indicated that she understood Carmon's instructions as to who to assign to that area, and the conversation ended. See id. ¶ 19. On August 20, 2017, Carmon spoke with Davis to see whether she had followed his instructions. See id. ¶¶ 20–21. During the conversation, Carmon alleges that he touched Davis on her right shoulder because it appeared to Carmon that Davis was attempting to sit on a chair with wheels on it, and Carmon was concerned that the chair could move in a way that could pose a risk to Davis. See id. ¶¶ 23–24. Carmon "innocently grabbed Sgt. Davis' shoulder so that she would not fall backwards." Id. ¶ 24. Carmon and Davis laughed about the incident, which a security camera recorded. See id. ¶¶ 22, 25–26.

On August 23, 2017, Davis told Carmon that she was mad at him for touching her shoulder. See id. ¶¶ 27–29. Davis was a survivor of domestic violence, a fact which Carmon knew. See id. ¶¶ 32, 35. Davis asked Carmon why he had "pushed her." Id. ¶ 29. Carmon denied that he pushed Davis, and stated that he would not touch her again. See id. ¶¶ 30–31. Although Davis suggested that she was considering whether to resign, Carmon urged her not to resign and believed that the

2

situation had been resolved. See id. ¶¶ 33–34. Carmon also allowed Davis to take off a few days to resolve some personal matters. See id. ¶ 34.

On August 28, 2017, Major Jeff Phillips ("Phillips") called Carmon and told him that Davis wanted to speak with Phillips. See id. ¶¶ 36–37. Later that day, Davis spoke with Phillips about the touching incident and her inability to "get along" with Carmon. Id. ¶ 38. Davis requested that Carmon be removed from her shift, but Phillips told Davis that he would move her, not Carmon. See id. ¶ 39. Immediately after meeting with Phillips, Davis filed a complaint against Carmon, alleging that Carmon, upset by Davis's failure to complete an assignment, had snatched a legal pad out of her hands, threw it, and pushed her. See id. ¶¶ 41, 43. On August 31, 2017, investigators met with Carmon to discuss Davis's complaint. See id. ¶ 42. The investigators and Carmon watched the recording of the incident multiple times. See id. ¶ 45. Carmon alleges that he did not understand why Davis was angry with him, and he denied that he had disciplined Davis. See id. ¶¶ 45–46. On September 6, 2017, the Sheriff's Office placed Carmon on administrative leave while the investigation continued. See id. ¶ 47.

On September 15, 2017, Phillips told Carmon that Sheriff Elks had decided to terminate Carmon's employment due to Davis's complaint. See id. ¶ 48. On September 22, 2017, Carmon met with Sheriff Elks. See id. ¶ 51. Carmon and Sheriff Elks watched the recording of the incident, and Carmon told his side of the story to Sheriff Elks. See id. ¶ 52. Carmon alleges that Sheriff Elks agreed that Carmon stopped Davis from falling. See id. ¶¶ 53–55. Although Sheriff Elks found Carmon's explanation plausible and thought that Carmon had a good reputation as a supervisor, Sheriff Elks decided to terminate Carmon's employment because he feared potential legal liability if Carmon remained employed at the Sheriff's Office. See id. ¶¶ 57–60.

Carmon argues that several white detention officers committed "more serious infractions of

3

the Sheriff's conduct policies" but "were either not disciplined" or "not terminated" for those infractions. Id. ¶ 61; see id. ¶ 65. Specifically, Carmon alleges that a white male detention officer engaged in sexually explicit conversations with two female officers but retained his job at the Sheriff's Office. See id. ¶ 62. Carmon also alleges that two other white deputies had an affair and sent each other nude pictures, but they too retained their jobs. See id. ¶ 63. Finally, Carmon alleges that a white male deputy "attempt[ed] to make inappropriate contact with [a] coworker's wife via text message," and he also retained his job. Id. ¶ 64.

On March 15, 2018, Carmon filed an EEOC charge, alleging race and age discrimination in violation of Title VII and the ADEA. See id. ¶ 66; [D.E. 1-2] 15. On March 21, 2018, the EEOC sent Carmon a notice of right to sue. See Am. Compl. [D.E. 20] ¶ 67; [D.E. 1-2] 16. On July 19, 2018, Carmon filed suit alleging violations of Title VII and North Carolina common law.

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted

inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[ ] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. Additionally, a court may take judicial notice of public records without converting the motion to dismiss into a motion for summary judgment. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

A.

In count one, Carmon alleges that defendants terminated his employment because of his race in violation of Title VII. See Am. Compl. [D.E. 20] ¶¶ 68–74. Title VII prohibits an employer from discharging an employee "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation in two ways. First, a plaintiff can show through direct evidence that racial discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence, a plaintiff can alternatively proceed under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hill v. Lockheed Martin Logistics

5

Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013). Carmon lacks direct evidence of discrimination and proceeds under the McDonnell Douglas burden-shifting framework.

Under McDonnell Douglas, a plaintiff establishes a prima facie case of race discrimination by showing that (1) he is a member of a protected class, (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of his discharge, and (4) the discharge occurred under circumstances permitting a reasonable inference of race discrimination. See, e.g., Hill, 354 F.3d at 285; Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Tahir v. Sessions, No. 5:16-CV-781-D, 2017 WL 1735158, at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 331 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [race] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147. To survive a motion to dismiss, a plaintiff need not "plead facts

sufficient to establish a prima facie case of race-based discrimination," but need only plausibly allege a statutory claim. Woods v. City of Greensboro, 855 F.3d 639, 648 (4th Cir. 2017); see McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585–88 (4th Cir. 2015); Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764–65 (4th Cir. 2003); Brown v. Goodwill Indus. of E. N.C., Inc., No. 4:17-CV-144-D, 2019 WL 80444, at *3 (E.D.N.C. Jan. 2, 2019) (unpublished).

As for defendants' motion to dismiss Carmon's race discrimination claim in his amended complaint, Carmon's Title VII race discrimination claim ekes across the line from possibility to plausibility. See Iqbal, 556 U.S. at 678–79; Twombly, 550 U.S. at 570. Thus, the court denies the motion to dismiss Carmon's race discrimination claim.

As for Carmon's Title VII retaliation claim, see Am. Compl. [D.E. 20] ¶ 69, Carmon has abandoned this claim. See [D.E. 31] 6 n.2; e.g., Bronitsky v. Bladen Healthcare, LLC, No. 7:12-CV-147-BO, 2013 WL 5327447, at *1 (E.D.N.C. Sept. 20, 2013) (unpublished); Mentch v. E. Sav. Bank, FSB, 949 F. Supp. 1236, 1247 (D. Md. 1997). Thus, the court grants defendants' motion to dismiss Carmon's Title VII retaliation claim.

B.

In count two, Carmon alleges wrongful discharge in violation of the public policy in the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.2. See Am. Compl. [D.E. 20] ¶¶ 75–79. In relevant part, the NCEEPA states that it is "the public policy of [North Carolina] to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race . . . by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2. Carmon alleges race discrimination. See Am. Compl. [D.E. 20] ¶¶ 75–79.

North Carolina law governs Carmon's wrongful discharge claim. Accordingly, the court

must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016); Twin City Fire Ins. Co., 433 F.3d at 369. If there are no governing Supreme Court of North Carolina opinions, the court may consider the opinions of the North Carolina Court of Appeals, treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[2] In predicting how the Supreme Court of North Carolina would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 397–98.

To state a claim for wrongful discharge in violation of public policy, a plaintiff must plausibly allege that he was discharged for an unlawful reason or purpose that violates a specific North Carolina public policy. Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 571–72, 515 S.E.2d 438, 441 (1999); see Onwe v. Waste Indus., Inc., No. 5:15-CV-611-D, 2016 WL 6330387, at *2 (E.D.N.C. Oct. 26, 2016) (unpublished); Bratcher v. Pharm. Prods. Dev., Inc., 545 F. Supp. 2d 533, 544 n.8 (E.D.N.C. 2008). North Carolina recognizes a claim for common law wrongful discharge in violation of public policy with the NCEEPA as the basis for that public policy. See McLean v. Patten Cmtys., Inc., 332 F.3d 714, 720 (4th Cir. 2003); Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000); Bratcher, 545 F. Supp. 2d at 544 n.8; Jackson v. Blue Dolphin Commc'ns of N.C., LLC, 226 F. Supp. 2d 785, 792 (W.D.N.C. 2002). If a plaintiff lacks direct evidence, courts analyze a wrongful discharge claim arising under the NCEEPA under the

---

[2] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

8

McDonnell Douglas burden-shifting framework. See Abels v. Renfro Corp., 335 N.C. 209, 218, 436 S.E.2d 822, 827 (1993); N.C. Dep't of Corr. v. Gibson, 308 N.C. 131, 136–37, 301 S.E.2d 78, 82 (1983); Sampson v. Hospira, Inc., 531 F. App'x 388, 389–90 (4th Cir. 2013) (per curiam) (unpublished).

Carmon's wrongful discharge claim turns on the same factual allegations as Carmon's Title VII race discrimination claim. See [D.E. 27] 12–13; [D.E. 31] 10–11; cf. Tims v. Carolinas Healthcare Sys., 983 F. Supp. 2d 675, 682 (W.D.N.C. 2013); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 621 (E.D.N.C. 2006). Thus, Carmon's wrongful discharge claim ekes across the line from possibility to plausibility. Accordingly, the court denies defendants' motion to dismiss Carmon's wrongful discharge claim.

C.

Finally, defendants contend that Pitt County is not liable for Sheriff Elks's decision to terminate Carmon. See [D.E. 27] 13–14. The court need not decide this issue because Carmon has voluntarily dismissed Pitt County. See [D.E. 31] 1 n.1. Thus, the court dismisses Pitt County.

III.

In sum, the court DENIES as moot Sheriff Elks's motion to dismiss [D.E. 10], GRANTS IN PART defendants' motion to dismiss [D.E. 26], DISMISSES Carmon's Title VII retaliation claim, and DISMISSES Pitt County from the action. The clerk shall continue management of the case.

SO ORDERED. This 26 day of February 2019.

JAMES C. DEVER III
United States District Judge

9