IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-433-D

| | |
|---|---|
| MICHAEL CARMON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| PAULA DANCE, in her official ) | |
| capacity as Pitt County Sheriff, et al., ) | |
| ) | |
| Defendants. ) | |

On September 22, 2017, Sheriff Neil Elks ("Sheriff Elks") terminated Lieutenant Michael Carmon's ("Carmon" or "plaintiff") employment. On July 9, 2018, Carmon (who is African American) filed a complaint in Wake County Superior Court against Sheriff Neil Elks, in his official capacity as Sheriff of Pitt County,[1] and "John Doe Surety Company," alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and wrongful discharge in violation of North Carolina public policy [D.E. 1-2].[2] On September 6, 2018, Sheriff Elks timely removed the action to this court [D.E. 1].

On February 26, 2019, the court dismissed Carmon's Title VII retaliation claim. See [D.E. 33]. On July 2, 2020, defendants moved for summary judgment [D.E. 49] and filed a memorandum

---

[1] Neil Elks served as Sheriff of Pitt County from 2010 to 2018. In November 2018, Paula Dance was elected Sheriff. The court has substituted Sheriff Dance [D.E. 37]. See Fed. R. Civ. P. 25(d).

[2] On November 5, 2018, Carmon filed an amended complaint [D.E. 20], adding Travelers Casualty and Surety Company of America ("Travelers Casualty") as a defendant. See [D.E. 20]. Travelers Surety is a Connecticut corporation that furnished a bond for Sheriff Elks pursuant to N.C. Gen. Stat. §§ 162-8 and 58-72-1. The court refers to the Sheriff and Travelers Casualty as "defendants".

and statement of material facts in support [D.E. 50–52]. On August 27, 2020, Carmon responded in opposition and filed a memorandum and statement of material facts [D.E. 58–60].[3] On September 9, 2020, defendants replied [D.E. 61]. As explained below, the court grants defendants' motion for summary judgment.

I.

On August 20, 2017, Carmon was supervising a shift of detention officers including Sergeant Nichelle Davis ("Davis") at the Pitt County Detention Center. See Carmon Dep. [D.E. 52-1] 40–42, 60–65; Davis Dep. [D.E. 52-2] 16–20. Around 2:45 p.m., Carmon approached Davis and asked her about an assignment he had given her. See Carmon Dep. [D.E. 52-1] 60–61; Davis Dep. [D.E. 52-2] 18–20. Davis responded that she was working on the assignment but had not yet completed it. See Carmon Dep. [D.E. 52-1] 60–61; Davis Dep. [D.E. 52-2] 18–20.

During the interaction, Carmon put his hand on Davis's arm. See Vid. Sur. There was no reason for Carmon to put his hand on Davis's arm. Davis then stepped backwards, stumbled, and landed in a rolling chair. See id. Carmon continued to hold onto to Davis's arm as she fell. See id. A surveillance camera captured the entire interaction. See id.; Roumpf Aff. [D.E. 52-10] ¶ 12.

---

[3] Local Civil Rule 56.1 provides that "[t]he memorandum opposing a motion for summary judgment shall be supported by a separate statement including a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs, and if necessary, additional paragraphs containing a statement of additional material facts as to which the opposing party contends there is a genuine dispute." E.D.N.C. Civ. R. 56.1(a)(2). "Each statement by the movant or opponent . . . must be followed by citation to evidence that would be admissible." Id. "Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." E.D.N.C. Civ. R. 56.1(a)(4).

Carmon answered "disputed" or "undisputed" in response to correspondingly numbered paragraphs in defendants' statement of facts, and then provided his own additional statement of material facts with citations to record evidence. See [D.E. 59]. Although Carmon should have followed the rule as written, the court declines defendants' invitation to strike Carmon's opposing statement.

2

Davis and Carmon disagree about the nature of the interaction.

Davis alleges that Carmon became agitated and raised his voice when Davis said she was still working on the assignment. See Davis Dep. [D.E. 52-2] 19–25, 31. Carmon instructed Davis to sit down, but Davis refused. See id. at 19–20. Carmon told Davis to sit down again, reached for Davis, and grabbed her arm. See id. at 20. Carmon pulled down on Davis's arm, causing Davis to fall backwards into the chair. See id. Davis stood up and told Carmon, "I hope you know that's recorded." Id. Carmon told Davis that they should leave the area before somebody misinterpreted what had happened. See id.

According to Carmon, he merely placed his hand on Davis's arm in course of their conversation. See Carmon Dep. [D.E. 52-1] 60–61. Davis lost her balance, and Carmon held onto her arm to prevent her from missing the rolling chair and falling. See id. Carmon told Davis, "Look, don't sit here and say that I pushed you, and we got these cameras up here, you know." Id. at 61. The two laughed and Davis pointed at the camera. See id.[4]

---

[4] Defendants contend that the court should disregard any evidence that contradicts the video recording. See [D.E. 50] 16–17. When a video "quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (quoting Scott v. Harris, 550 U.S. 372, 378, 380 (2007)); accord Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008). A court, however, may not reject a plaintiff's account on summary judgment when video evidence merely "offers some support for a [defendant's] version of events." Witt, 633 F.3d at 276.

Carmon does not dispute the events in the video. Carmon admits that he touched Davis's arm and that held onto her arm when she stumbled backwards. See Carmon Dep. [D.E. 52-1] 61; [D.E. 58] 2; [D.E. 59]. Carmon disputes, however, whether the interaction was hostile and whether he pulled on Davis's arm. See [D.E. 58] 2; [D.E. 59]. The video lacks sound and does not "blatantly" contradict Carmon's version of the events. See Witt, 633 F.3d at 277; Vid. Sur. Nonetheless, the critical issue is how Sheriff Elks perceived the interaction based not only on the video, but also the ensuing investigation of the interaction.

3

On August 23, 2017, Davis approached Carmon, told him she was upset that he put his hand on her and asked for two days off to think about it. See id. at 65–66, 71; Davis Dep. [D.E. 52-2] 24–26. On August 28, 2017, Davis reported the incident to the Chief of Detention Services, Major Jeff Phillips ("Major Phillips"). See Davis Dep. [D.E. 52-2] 22–24. Davis submitted a written complaint, which Major Phillips forwarded to Chief Deputy Randy Gentry ("Chief Deputy Gentry"), who reported the incident to Sheriff Elks. See Davis Compl. [D.E. 52-6]; Elks Dep. [D.E. 52-3] 12–13. Sheriff Elks ordered an Internal Affairs ("IA") investigation. Gentry assigned Detectives William Early ("Early") and Priscilla Hicks ("Hicks") to investigate. See Elks Dep. [D.E. 52-3] 12–13; Hicks Dep. [D.E. 52-4] 25–26; Early Dep. [D.E. 52-5] 21–22; IA Rep. [D.E. 52-7]. Early and Hicks reviewed the surveillance video and interviewed Carmon and Davis, who repeated their versions of the incident. See Hicks Dep. [D.E. 52-4] 27–42; Early Dep. [D.E. 52-5] 27–32; IA Rep. [D.E. 52-7] 2–7. Early and Hicks also had Carmon take a voice stress analysis test. See Hicks Dep. [D.E. 52-4] 44; Early Dep. [D.E. 52-5] 39–40; IA Rep. [D.E. 52-7] 6; Mitchell Aff. [D.E. 52-8] ¶¶ 10–12; V.S.A. [D.E. 52-9]. The test indicated deception when Carmon answered the questions "Were you trying to get Sgt. Davis to sit down while you were talking to her?" and "Did you physically attempt to make Sgt. Davis sit down?" Mitchell Aff. [D.E. 52-8] ¶¶ 10–13; V.S.A [D.E. 52-9]. Based on their investigation, Hicks and Early concluded that Carmon had physically assaulted Davis in violation of the Pitt County Workplace Violence Policy. See Hicks Dep. [D.E. 52-4] 46–47; Early Dep. [52-5] 42–43; IA Rep. [52-7].

After reviewing Hicks and Early's written IA report and watching the video multiple times, Sheriff Elks concluded that Carmon had violated multiple workplace policies. See Elks Dep. [D.E. 52-3] 19–21. Sheriff Elks decided to terminate Carmon's employment. See id. Sheriff Elks instructed Major Phillips to notify Carmon of the termination and to give Carmon the option to

4

resign. See id. at 22. When Major Phillips did so, Carmon requested a meeting with Sheriff Elks. See id. at 22–23.

On September 22, 2017, Sheriff Elks and Carmon met. See id. at 23. Carmon and Sheriff Elks reviewed the video together, and Carmon would not admit to pushing or pulling Davis. See id. at 23–24. Carmon rejected Sheriff Elks's offer to let him resign, and Sheriff Elks terminated Carmon's employment. See id. at 23–25; Carmon Dep. [D.E. 52-1] 79–81.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott, 550 U.S. at 378; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252;

5

see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

Defendants' motion for summary judgment requires the court to consider Carmon's state law claim, and the parties agree that North Carolina law applies to that claim. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[5] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

---

[5] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

6

Case 5:18-cv-00433-D   Document 64   Filed 01/22/21   Page 6 of 20

A.

Carmon alleges that Sheriff Elks terminated his employment because of his race in violation of Title VII. Title VII prohibits an employer from discharging an employee "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation in two ways. First, a plaintiff can show through direct evidence that racial discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence, a plaintiff can proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013). Carmon lacks direct evidence of race discrimination and proceeds under the McDonnell Douglas burden-shifting framework.

Under McDonnell Douglas, a plaintiff establishes a prima facie case of racial discrimination by showing that (1) he is a member of a protected class, (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of his discharge, and (4) the discharge occurred under circumstances permitting a reasonable inference of race discrimination. See, e.g., Hill, 354 F.3d at 285; Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Tahir v. Sessions, No. 5:16-CV-781-D, 2017 WL 1735158, at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 331 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant employer to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of

7

production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant employer offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the defendant employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147.

Defendants do not contest the first three elements of Carmon's prima facie case. See [D.E. 50] 9. However, defendants contend that even viewing the evidence in the light most favorable to Carmon, Carmon cannot show that his termination occurred under circumstances giving rise to a reasonable inference of race discrimination. See id. at 9–12.

A plaintiff can prove that his discharge occurred under circumstances giving rise to an inference of race discrimination by demonstrating that the employer treated similarly situated comparators, who were not members of plaintiff's protected class, differently. See Laing v. Fed. Express Corp., 703 F.3d 713, 719 (4th Cir. 2013); Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008); Hughes, 48 F.3d at 1383. A plaintiff need not cite a comparator to establish the fourth element, but if he does, he must demonstrate that similarly situated employees were not treated equally. See Burdine, 450 U.S. at 258; McDonnell Douglas, 411 U.S. at 804; Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (per curiam) (unpublished). Vague comparator statements are insufficient to establish the fourth element. See Haywood, 387 F. App'x at 359–60; Lightner, 545 F.3d at 265.

8

To establish a valid comparator, the plaintiff must show that he and the comparator were "similar in all relevant respects." Haywood, 387 F. App'x at 359; see Smith v. Stratus Comput., Inc., 40 F.3d 11, 17 (1st Cir. 1994); Barski v. Cyberdata Techs., Inc., No. 8:17-cv-3593-PX, 2020 WL 4471827, at *6 (D. Md. Aug. 4, 2020) (unpublished); Wilson v. City of Chesapeake, 290 F. Supp. 3d 444, 457 (E.D. Va. 2018), aff'd, 738 F. App'x 169 (4th Cir. 2018) (per curiam) (unpublished). The comparator must have "dealt with the same supervisor, [been] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992); see Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–24 (4th Cir. 2019); Haywood, 387 F. App'x at 359; Wilson, 290 F. Supp. 3d at 457–58. However, "a comparison between similar employees will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." Haynes, 922 F.3d at 223 (quotation omitted); see also Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100, 1107 (4th Cir. 1985).[6] In the disciplinary context, [t]he most important variables . . . and the most likely sources of different but nondiscriminatory treatment, are the nature of the offense committed and the nature of the punishments imposed." Moore, 754 F.2d at 1105.

In support of his prima facie case, Carmon provides several examples of Caucasian officers who violated personnel policy concerning sexual misconduct but were not terminated. See, e.g., Am. Compl. [D.E. 20] ¶¶ 61–65. Carmon alleges that "a Caucasian male Sheriff's Department employee,

---

[6] Courts frequently consider whether the plaintiff and comparator held the same position. See, e.g., Gary v. Facebook, Inc., 822 F. App'x 175, 181 (4th Cir. 2020) (unpublished); Wright v. SunTrust Bank, No. RDB-15-3985, 2017 WL 633470, at *6 (D. Md. Feb. 16, 2017) (unpublished).

9

'JCP' was accused by female officers of engaging in sexually explicit conversation that had offended them" and was "sent home without pay, but not terminated." Id. ¶ at 62; see [D.E. 58] 7; [D.E. 60-1] ¶ 11. Two Caucasian deputies "were involved in an adulterous relationship that included the dissemination of nude pictures via cellular devices," but were not terminated. Am. Compl. [D.E. 20] ¶ 63; see [D.E. 58] 9. Two Caucasian officers had an affair and had to take leave without pay, but were not terminated. See [D.E. 58] 9. A Caucasian deputy attempted to make inappropriate contact with his coworker's wife via text message and was suspended and demoted, but not terminated. See Am. Compl. [D.E. 20] ¶ 64. A Caucasian deputy received a sexual harassment complaint from a female deputy and was moved to a different division and placed on leave without pay, but not terminated. See [D.E. 58] 9. A Caucasian sergeant, touched a female officer's buttocks and "was demoted to an officer, but his employment was not terminated," even though a different female officer had filed a separate sexual harassment complaint against him. [D.E. 59] ¶ 48; see [D.E. 58] 8–9; [D.E. 60-1] ¶ 11.

Carmon provides additional examples of comparators who engaged in a range of non-sexual misconduct but were not terminated. Carmon alleges that a Caucasian male had alcohol on his breath at a staff training and was sent home without pay and demoted, but not terminated. See [D.E. 58] 8. A married Caucasian couple working for the department knew of a coworker carrying on an illicit relationship with an inmate, failed to report it, and were disciplined and required to take leave without pay, but not terminated. See id.; [D.E. 60-1] ¶ 11. A Caucasian detention officer was detained for impersonating a law enforcement officer, but not disciplined or terminated. See [D.E. 58] 8; [D.E. 60-1] ¶ 11.

Carmon proffers one African American comparator. See [D.E. 60-1] ¶ 11. Carmon alleges that an African American sheriff deputy wrote a sexually suggestive note to a white female detention

officer and was terminated. See id.

Carmon also offers several comparators for whom he provides no racial identification. See id. For example, an officer shot a fox and was not disciplined. See id. Carmon also alleges an officer and a contract nurse had an affair, but the officer received no discipline. See id.

Defendants respond that Carmon lacks personal knowledge about the comparators and that Carmon's comparators are not sufficiently similar to permit a reasonable jury to find his termination occurred under circumstances giving rise to an inference of race discrimination. See [D.E. 50] 9–12. According to defendants, the comparators are insufficiently similar because (1) they did not engage in substantially similar conduct, and (2) they did not hold the supervisory position of lieutenant over the person physically assaulted. See id. at 11–12.

Carmon replies that his comparators are sufficiently similar to establish an inference of race discrimination. See [D.E. 58] 5–9. He argues that his comparators received less severe discipline from the same supervisor, Sheriff Elks, for misconduct and violations of office policy. See id. at 7, 9.

Even viewing the evidence in the light most favorable to Carmon, his comparators are not similarly situated. The sheriff supervises all employees in his office. See N.C. Gen. Stat. § 153A-103(1) ("Each sheriff . . . has the exclusive right to hire, discharge, and supervise the employees in his office."); Young v. Bailey, 368 N.C. 665, 669, 781 S.E.2d 277, 280 (2016) ("[T]he sheriff has singular authority over his or her deputies and employees and is responsible for their actions."). Pitt County Sheriff's Office employees are subject to the Pitt County Workplace Violence Policy. See Roumpf Aff. [D.E. 52-10] ¶¶ 7–9. Employees are also subject to the Pitt County Sheriff Office Rules and Regulations. See IA Rep. [D.E. 52-7] 1. However, while being subject to the same supervisor and standards is helpful, the comparators also must have engaged in substantially similar

11

conduct and have held a substantially similar supervisory position over the victim.

Carmon's proferred comparators fail because none of them were a lieutenant who engaged in a substantially similar physical assault. In a disciplinary context, the most important comparison is "the nature of the offenses committed." Moore, 754 F.2d at 1105. Sheriff Elks terminated Carmon for physically assaulting Davis in violation of personnel policy. See Elks Dep. [D.E. 52-3] 20–21; Hicks Dep. [D.E. 52-4] 47; Early Dep. [D.E. 52-5] 32; IA Rep. [D.E. 52-7] 7–8. None of Carmon's comparators physically assaulted another employee. Rather, they were disciplined for various offenses including sexual misconduct and non-sexual misconduct. See Am. Compl. [D.E. 20] ¶¶ 61–65; [D.E. 58] 7–9; [D.E. 60-1] ¶ 11. Moreover, nothing in the record suggests that any of the comparators were a lieutenant who physically assaulted a subordinate officer. In fact, Carmon admitted that he was unaware of any employee (much less a lieutenant) who had assaulted another officer. See Carmon Dep. [D.E. 52-1] 99–100.

The best comparator Carmon proffers is a Caucasian sergeant demoted for touching a subordinate female officer's buttocks. See [D.E. 59] ¶ 48; [D.E. 58] 8–9; [D.E. 60-1] ¶ 11. Assuming arguendo that both Carmon and Caucasian sergeant were disciplined for an overlapping offense category, the Caucasian sergeant's conduct is different enough to disqualify him as a comparator. Comparators can be disciplined for an overlapping offense category, but if the underlying conduct is materially different enough in circumstances or severity, substantial similarity does not exist. See Kelley v. United Parcel Serv., Inc., 528 F. App'x 285, 286–87 (4th Cir. 2013) (per curiam) (unpublished); Saxton v. Town of Irmo Police Dep't, No. 3:15-1244-JFA, 2017 WL 676579, at *3 (D.S.C. Feb. 21, 2017) (unpublished). The underlying nature of their conduct differentiates the Caucasian sergeant and Carmon. According to Carmon, the Caucasian sergeant touched a subordinate's buttocks. The record is unclear about the circumstances preceding the touch.

12

Cf. Smith, 40 F.3d at 17 ("sketchy evidence, lacking a sufficient foundation for a legally relevant comparison of [plaintiff and another], cannot support an inference that [plaintiff's] dismissal was motivated by discriminatory animus"). In contrast, Sheriff Elks reasonably concluded, based on the video and the internal investigation, that there was no reason for Lieutenant Carmon to have touched Sergeant Davis's arm during a conversation about an unfinished assignment and that in doing so Carmon engaged in a physically aggressive assault.

Alternatively, even if Carmon established a prima facie case, the burden shifts to defendants to produce evidence that Carmon's termination was "for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254. A defendant must present its legitimate, non-discriminatory reason "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. at 255–56. If the employer offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves, 530 U.S. at 143; King, 328 F.3d at 150–54.

In order to overcome this burden, a plaintiff must show that the employer's "explanation is unworthy of credence or [] offer[] other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish, 359 F.3d at 336 (quotation omitted); see Reeves, 530 U.S. at 147. The court does not sit to decide whether the employer in fact discriminated against the plaintiff on an illegal basis. See, e.g., Holland v. Wash. Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Likewise, the court does not evaluate the wisdom, fairness, or meritoriousness of the employer's justification for its actions. See Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006); DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("[The c]ourt does not sit as a kind of super-personnel department

13

weighing the prudence of employment decisions . . . . [I]t is not our province to decide whether the reason was wise, fair, or even correct, [] so long as it was truly the reason for the plaintiff's termination.") (quotations and citations omitted); see also Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 903 (4th Cir. 2017); Laing, 703 F.3d at 722; Jiminez v. Mary Wash. Coll., 57 F.3d 369, 377 (4th Cir. 1995). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. A plaintiff may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [race]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

An employer is entitled to summary judgment on the issue of pretext if the employee "create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148; Hux, 451 F.3d at 315 ("[T]he plaintiff cannot seek to expose [the defendant's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it."). A plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of a legitimate nondiscriminatory reason for discharge. See Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999); Iskander v. Dep't of the Navy, 116 F. Supp. 3d 669, 679 (E.D.N.C. 2015), aff'd, 625 F. App'x 211 (4th Cir. 2015) (per curiam) (unpublished). Thus, a plaintiff's mere speculation about pretext is not enough to survive summary judgment. See, e.g., Holland, 487 F.3d at 216–18; Mereish, 359 F.3d at 336–39; Hawkins, 203 F.3d at 280–81.

14

Defendants assert that Sheriff Elks had a legitimate, non-discriminatory reason for terminating Carmon. See [D.E. 50] 12. Specifically, Sheriff Elks fired Carmon because he honestly believed that Carmon violated multiple personnel policies, including the Pitt County Workplace Violence Policy. See Wrk. Pol. [D.E. 52-11].

Carmon responds that Sheriff Elks's stated reason for firing Carmon lacks credence and is a pretext for race discrimination. See [D.E. 58] 10. In support, Carmon cites Sheriff Elks's decision not to press criminal charges. See id. at 10–11. Carmon also notes that Sheriff Elks expressed concerns about Davis suing the department. See id. at 11. Moreover, Carmon argues that Sheriff Elks agreed with Carmon's version of events. See id. at 11–12. Lastly, Carmon argues that Sheriff Elks's offers to let Carmon resign and to help Carmon find future employment conflict with the decision to fire Carmon for "egregious" conduct. Id. at 12.

The court rejects Carmon's arguments. Sheriff Elks terminated Carmon's employment for physically assaulting another employee in violation of multiple internal policies. See Elks Dep. [D.E. 52-3] 20–21. The Pitt County Sheriff's Office adopted the Pitt County Workplace Violence Policy ("Policy"). See Roumpf Aff. [D.E. 52-10] ¶¶ 7–9. The Policy prohibits "acts of aggression and violence" by employees, including "any act or threat of bodily harm" and "physical altercations." Wrk. Pol. [D.E. 52-11] 1. A "[p]hysical altercation" is defined as "unwanted or hostile physical contact such as hitting, fighting, pushing, shoving, throwing objects, grabbing, holding, touching, or any unwanted physical contact." Id. at 2. Penalties for violating the Policy include "appropriate disciplinary action, which may include termination." Id. at 3. In addition, Sheriff's Office employees are subject to the Pitt County Sheriff Office Rules and Regulations. See IA Rep. [D.E. 52-7] 1. Section 2.05, Violations of Laws, provides that "[m]embers will observe and obey all

15

federal laws and statu[t]es, state laws and statu[t]es, and local ordinances . . . ." Id. Section 2.08, Standard of Conduct, provides:

> Members will conduct their private and professional lives in such a manner as to avoid bringing discredit upon the Sheriff's Office or impairing the effective operation of it. Any conduct which is unbecoming a member subjects the member to disciplinary action. Conduct unbecoming a member is any behavior . . . includ[ing] . . . displays of anger . . . sexual harassment, engaging in assault or affray, or other breach of the peace . . . .

Id.

After reviewing the IA Report and watching the surveillance video multiple times, Sheriff Elks believed that Carmon had no reason to touch Davis during their conversation and touched Davis in an unlawful manner and in violation of workplace policies against unwanted or hostile physical conduct. See Elks Dep. [D.E. 52-3] 20–21. The IA Report, video surveillance, and deposition testimony support Elks's belief. The record demonstrates that Sheriff Elks fired Carmon based on his genuine belief that Carmon had violated multiple policies.

As for Carmon's challenges to Sheriff Elks's reasoning, they do not create a genuine issue of material fact as to pretext. First, Sheriff Elks's failure to press criminal charges does not undermine his decision to fire Carmon. Sheriff Elks did not press charges because he did not believe Carmon's conduct merited criminal charges and because Davis did not wish to press charges. See id. at 21. The sheriff's failure to press assault charges does not contradict his reasoning, but rather reflects his judgment for best addressing the workplace incident. It is not the court's job to weigh the merits of Sheriff Elks's actions, but rather to determine whether his reason was pretextual. See Hux, 451 F.3d at 315 ("Duty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with the authority to strip employers of their basic business responsibilities."); DeJarnette, 133 F.3d at 298–99.

16

Second, Carmon contends that Sheriff Elks's stated concerns about litigation undermine his reasoning when comparators also left the department vulnerable to litigation. Again, Sheriff Elks's reasoning about litigation risk is a judgment that the court declines to scrutinize. See Hux, 451 F.3d at 315; DeJarnette, 133 F.3d at 298–99. Moreover, as discussed, Carmon's proffered comparators are not sufficiently similar. Whatever Sheriff Elks may have determined regarding litigation in other situations does not create a genuine issue of material fact about Carmon's termination. Cf. Hux, 451 F.3d at 317–18.

Third, Carmon asserts that Sheriff Elks agreed with his explanation that he stopped Davis from falling.[7] This supposed agreement, however, does not indicate pretext. In his deposition, Carmon recounts his conversation with Sheriff Elks: "[You] said that I pushed her, right. Yeah, you pushed her. I said, but you said that I stopped her from falling, right. Yeah, yeah, you stopped her falling. I said how can I push her one second and then stop her from falling the next second. He just dropped his head again." Carmon Dep. [D.E. 52-1] 80. Even if Sheriff Elks repeated Carmon's assertions and hung his head, that evidence does not create a genuine issue of material fact as to pretext about Carmon's termination. Construing the interaction in the light most favorable to Carmon, the interaction only shows agreement that Carmon stopped Davis from falling. However, agreeing that Carmon stopped Davis from falling does not contradict Sheriff Elks's belief that Carmon had no reason to touch Davis in the first place and unlawfully assaulted Davis before he sought to stop her from falling. The two are independent actions and do not create a question of material fact about Carmon's termination. Cf. Hux, 451 F.3d at 315.

---

[7] Sheriff Elks does not recall agreeing that Carmon stopped Davis from falling. See Elks Dep. [D.E. 52-3] 24.

17

Lastly, Sheriff Elks's offer to permit Carmon to resign or help Carmon secure future employment does not suggest pretext. When Sheriff Elks terminated Carmon's employment, Carmon had worked for the Pitt County Sheriff's Office for 23 years. It is not unusual for an employer to permit a person to resign and to provide a recommendation in order to avoid a termination. Just because an employer offers to help a long-term fired employee does not contradict or undermine a genuine reason for the termination. Thus, Carmon fails to raise any genuine issue of material fact as to the veracity of Sheriff Elks's decision to fire Carmon. Accordingly, the court grants defendants' summary judgment motion on Carmon's Title VII claim.

B.

Carmon alleges a wrongful discharge claim against defendants in violation of North Carolina public policy. Under North Carolina law, an employer generally may terminate an at-will employee for any reason. See Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999). North Carolina recognizes a narrow exception to that general rule if an employee's termination violates North Carolina public policy. See Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion at 165 N.C. App. 32, 43–50, 598 S.E.2d 151, 159–63 (2004) (McCullough, J., dissenting)); Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416 S.E.2d 166, 167–70 (1992); Coman v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). To prove a wrongful discharge claim in violation of North Carolina public policy, a plaintiff must identify and rely upon a specific North Carolina statute or North Carolina constitutional provision stating North Carolina's public policy. See Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–70; Coman, 325 N.C. at 176, 381 S.E.2d at 447; Horne v. Cumberland Cnty. Hosp. Sys., Inc., 228 N.C. App. 142, 146, 746 S.E.2d 13, 17–19 (2013);

18

Gillis v. Montgomery Cnty. Sheriff's Dep't, 191 N.C. App. 377, 379–81, 663 S.E.2d 447, 449–50 (2008); Whitings v. Wolfson Casing Corp., 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); Considine v. Compass Grp. USA, Inc., 145 N.C. App. 314, 321, 551 S.E.2d 179, 184, aff'd, 354 N.C. 568, 557 S.E.2d 528 (2001) (per curiam).

Carmon relies on the North Carolina Equal Employment Practices Act ("NCEEPA") as the source of North Carolina's public policy. The NCEEPA states that it is "the public policy of [North Carolina] to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race . . . by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2(a). Carmon contends that Sheriff Elks terminated his employment because of his race.

The legal standards for a state law racial discrimination claim are the same as for a Title VII claim. If a plaintiff lacks direct evidence, courts analyze a wrongful discharge claim arising under the NCEEPA under the McDonnell Douglas burden-shifting framework. See Sampson v. Hospira, Inc., 531 F. App'x 388, 389–90 (4th Cir. 2013) (per curiam) (unpublished); Abels v. Renfro Corp., 335 N.C. 209, 218, 436 S.E.2d 822, 827 (1993); N.C. Dep't of Corr. v. Gibson, 308 N.C. 131, 136–37, 301 S.E.2d 78, 82 (1983).

Carmon's wrongful discharge claim fails for the same reason his Title VII claim fails. No rational jury could find that Sheriff Elks terminated Carmon's employment because of his race. Accordingly, the court grants defendants' summary judgment motion on Carmon's wrongful discharge claim under North Carolina law.

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 49]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and

19

this court's local rules. The clerk shall close the case.

SO ORDERED. This 22 day of January 2021.

                                               JAMES C. DEVER III
                                               United States District Judge